FRED GRIMM ET AL., APPELLEES, V. ELKHORN VALLEY
DRAINAGE DISTRICT, APPELLANT.

FILED APRIL 16, 1915.     No. 17943.

1. **Eminent Domain:** AWARD: AFFIRMANCE. Where a drainage district
was established, and the commissioners appointed by the county
court condemned the land sought to be taken for the purpose of
the ditch, and determined its value as appropriated, and to what
extent the remainder of the land of the appellees was damaged by
the taking of the strip and the putting in of the ditch, and assessed
the damages sustained at $600, and subsequently, on an appeal to
the district court, the jury assessed the damages at $3,310.63, and
judgment was rendered on such verdict, such verdict and
judgment will be allowed to stand, unless it is shown that they are
clearly wrong.

2. ————: CONDEMNATION PROCEEDINGS: DRAINAGE. The irrigation of
arid lands, the straightening of water courses, and the drainage of
swamp and overflowed lands are subjects of public concern, not to
be condemned by the courts, where the constitution and the legisla-
ture have provided that the acts contemplated may be done.

3. **Evidence** examined, and *held* to sustain the verdict.

4. **Eminent Domain:** TRIAL: INSTRUCTIONS. The request for instruc-
tions refused and the instructions given, examined in the body of
the opinion, and *held* to be without prejudice.

APPEAL from the district court for Douglas county:
GEORGE A. DAY, JUDGE. *Affirmed.*

*Courtright & Sidner,* for appellant.

*Myron L. Learned, contra.*

HAMER, J.

This is an appeal from the judgment of the district
court for Douglas county. The petitioner, the Elkhorn
Valley Drainage District, in August, 1909, filed a petition
in the county court of Douglas county seeking to condemn
certain land within the limits of the said drainage district,
and on November 24, 1909, filed a supplemental petition al-
leging that the defendants were the owners of the south-

west quarter of the northeast quarter, the south half of the northwest quarter, the north half of the southwest quarter, and the southeast quarter of the southwest quarter, all in section 23, township 15, range 10, Douglas county, Nebraska. The defendants became the owner of this land in 1904 or 1905 through the death of their uncle. The petitioner is a corporation organized under the provisions of ch. 153, Laws 1907, and later laws amendatory thereof and supplemental thereto for the purpose of draining lands, etc., within a certain drainage district of which the lands of the defendants is a part. The petition alleges that the corporation is organized under the law above referred to and other laws amendatory thereof and supplemental thereto, and alleges that it is authorized under and by virtue of said laws to locate, construct, excavate and maintain a system of drainage within the said district, and to take and appropriate real estate by the right of eminent domain for the purposes of said drainage district and for the purpose of locating, constructing, excavating and maintaining such system of drainage.

It is further alleged in the petition that the Elkhorn Valley Drainage District embraces territory in Douglas and Sarpy counties, Nebraska, and that it is bounded on the north by the north line of Douglas county, on the west by the Platte river, and on the east and south by certain lines attempted to be shown by certain blue prints filed in connection with the petition marked exhibits A, B, C, D, E and F, and made a part of the petition. The petition alleges that, in furtherance of the projects of the petitioner and appellant, the appellant found it necessary to take a strip of land 100 feet wide on each side of the center line of a ditch to be constructed as then surveyed, and extending across from the east line to the south line of the said southeast quarter of the southwest quarter, and that said ditch would contain about 4.2 acres. The land of the appellees affected and damaged by the putting in of the ditch lies in the east half of the southwest quarter of said section 23, most of the land so affected being in the southeast quarter of the southwest quarter. The ditch leaves the

river in the northeast quarter of the northeast quarter of section 26, on land belonging to C. F. Backhus, and runs northeasterly across the southeast corner of the southeast quarter of the southwest quarter of section 23, belonging to the defendants, and thence onto and through land belonging to James B. Rodgers, until it strikes the river near the center of the northwest quarter of the southeast quarter of said section 23.

Two of the appellees have lived on the land for several years, their house being on the southeast quarter of the northwest quarter of section 23. They got at that part of their land lying on the east or south side of the Elkhorn river by crossing a bridge northeast of their houses, and thence continued northeasterly on the road to a point where it intersected a road running south and thence south along that road until they got to the southwest quarter of the southeast quarter of section 23, which belonged to James B. Rodgers, and thence across that land over a roadway which had been used for 35 or 40 years to their own land.

The commissioners appointed by the county court under the petition for condemnation made an award condemning the land sought to be taken and allowing $600 damages, from which award the appellees appealed to the district court.

The issues involved were: What was the value of the strip of land appropriated by the appellant? And to what extent was the remainder of the land of the appellees damaged by the taking of the strip and the putting in of the ditch? There was a trial to a jury in the district court, and this jury, under the supervision of the court, inspected the land and its surroundings at the request of the appellant. After making this inspection, listening to the evidence and the instructions of the court, the jury returned a verdict for appellees for $3,310.63.

The first assignment of error alleged by appellant is: "The court erred in giving instruction No. 7 on its own motion with reference to a road across the Rodgers land." The instruction complained of reads: "As bearing upon

the question of the value of the land, testimony was introduced as to the means of access to the land over a road running through the Rodgers' land. In this connection you are instructed that, if you believe that for a period of ten years immediately preceding the construction of the ditch the plaintiffs and others having occasion to use the road were permitted by Mr. Rodgers to use the road in question without objection or protest for the full period of ten years, such usage by plaintiffs and others would create an easement or right of way across the Rodgers land."

There is also a second assignment, which may be considered along with the first. It is that the court erred in refusing to give instruction No. 3, asked by appellant, with reference to a right to travel across the Rodgers land. It reads as follows: "You are instructed that the plaintiffs Grimm had no legal right to travel across the Rodgers land for any time in the future, and that their prevention from travel across the Rodgers land by the digging of the cut-off ditch is not to be considered by you as an element of damage to them."

Adolph Grimm, one of the appellees, testified that he understood that the appellees had a legal right to travel the road across the Rodgers land; that it had been traveled for the last 30 or 40 years; that Mr. Rodgers had a piece of land on the north side of the river, and that the appellee testifying always considered he had a legal right to go over their land to get to his land. Mr. Courtright, for the petitioner, asked the witness, Adolph Grimm: "Q. Then, as a matter of fact, in the working of this land in the past, and before the drainage ditch was dug, you went from your home around on the highway northeast, and then in a southerly direction, and then went across the Rodgers land, just crossing it because he permitted you to do so, and made no objection—is that it? A. I understand that we have a legal right to travel this road, and it has been traveled for the last 30 years—30 or 40 years.; and, another thing, he has a piece of land on the north side of the river, and we always considered it a legal right for

him to go through our land to get to his land." Mr. Courtright then said to the witness: "Q. Tell us on what you base your opinion." And the witness answered: "For the simple fact that there never was any objection to it; and another thing, Mr. Rodgers himself, while I was on the farm, gave me notice to come and help to work the road and maintain it down this hill." He then testified that nearly every year they fixed up the road; that during all the time they traveled the same course; that last year four of them worked half a day; that pretty nearly every year they farmed the land they fixed the road; that the uncle of the witness and the people who rented the land in controversy from his uncle had gone over the road across the Rodgers land for 30 or 40 years; that Mr. Rodgers never made any objection to him or to any one else, so far as he knew; that no objection was ever made to Rodgers going across the land of the appellees; that other people used the road going across Rodgers land, and had for many years, to get to land which they owned on that side of the river; that they helped to maintain and repair the road.

Fred Grimm, one of the appellees, testified that he went down the road across Rodgers land while working for his uncle in 1884; that it had been used every year since then; that he understood that it had been used four to six years before 1884.

Earnest Grimm, one of the appellees, testified that he had known the road across the Rodgers land since 1895; that people had been going over that road to get to the land in controversy during all the years since 1895; that it was used for many years prior to 1895 as he understood it.

The evidence shows that the appellees and their grantor had used the road across Mr. Rodgers' land under a claim of right and without objection or protest on his part for more than ten years. In *Majerus v. Barton*, 92 Neb. 685, this court held: "Where there has been an open, visible, continuous and unmolested use of a roadway across the premises of another for a period exceeding ten years, it

will be presumed to be under a claim of right, and not by the license of the owner; and, where one seeks to close a way over his land which has been enjoyed by his neighbor for such period, he has the burden of showing that the use was permissive, and not under a claim of right, and, if he fails to overcome such presumption by a preponderance of the evidence, his case must fail."

It would not seem that the appellant should be permitted to question the right of continuation of the use which had existed for 30 or 40 years, as the evidence shows.

The third assignment of error is that the court erred in refusing to give instruction No. 1, which is as follows: "You are instructed that the fact that there is a section line at the south side of the land involved in this action is wholly immaterial, and not to be considered by you in any way."

Adolph Grimm, one of the appellees, testified that he had walked the section line from the public highway west to the ditch; that the section line is between 200 and 300 feet south of where you leave the highway to take the road through the Rodgers land; that the natural contour of the land along the section line is practically the same as on the Rodgers land; that just as good a road or better could be put in on the section line as the road on Mr. Rodgers' land. We think the proximity of a section line over which a road might be located was proper for the jury to consider in connection with the question of the accessibility of the land involved.

The fourth assignment of error is that the court erred in giving instruction No. 1, requested by the plaintiffs, as follows: "You are instructed that all the damages which the plaintiffs sustained by reason of the condemnation of the 200-foot strip, and any and all damages which the adjoining land of the plaintiffs sustained by reason of the taking of the 200-foot strip, based on a proper use of the tract so condemned, should be allowed in this case, under the specific instructions heretofore given you by the court. In other words, the plaintiffs cannot bring another action for damages based on the taking of the 200-foot strip and

damages to adjoining land, unless it be that the strip of land condemned is used in an improper and illegal manner." We are unable to discover any prejudicial error in the instruction quoted.

In connection with the above alleged error, it is insisted that the affidavit of Mr. Courtright, of counsel for the petitioner, should be considered. Mr. Courtright's affidavit attempts to allege prejudicial conduct on the part of the attorney for the appellees. It states that Mr. Courtright was the attorney for the petitioner in the trial held in the district court, and that in the closing argument the attorney for the appellees "repeatedly stated that the drainage district had been three years in diverting the Elkhorn river into the cut-off ditch; that it had not yet succeeded; that as yet it was at the most only a theory; that it was doubtful if the water ever would be diverted; that the land was taken by the defendant without the consent of the plaintiffs, and that all doubts in the case should be resolved in favor of the plaintiffs; and that no subsequent action could be brought for any damages if the water never was diverted; and that if the jury did not find for the plaintiffs for the full value of the 44-acre tract, and the district never did divert the water into the cut-off ditch, the plaintiffs would lose without hope or possibility of future recovery."

It is not shown by the record that any objection was made to the argument of Mr. Learned. If Mr. Courtright desired to avail himself of his contention, he should have made an objection then, and the matter should have been ruled upon by the court.

The fifth assignment of error reads: "The court erred in refusing to give instruction No. 4, asked by defendant, as follows: 'You are instructed that it is the legal duty of the defendant to in good faith proceed with all reasonable expedition and to use all reasonable methods to wholly divert the channel and water of the Elkhorn river from its present channel into the cut-off across the land of the plaintiffs.'" It is not clear how the refusal to give this instruction was prejudicial to the drainage district.

The good faith of the appellant in proceeding with expedition to divert the channel would certainly not relieve it from any legal liability incurred.

The sixth assignment of error reads: "The court erred in refusing to give instruction No. 8, asked by defendant, as follows: 'You are instructed that it is the legal duty of a party suffering or about to suffer injury or damage at the hands of another, for which that other may be liable, to use all reasonable effort to make the injury or damage as small as possible, and that a party may not needlessly abandon property or the use of it and recover the damage caused by such abandonment from another.' "

Our attention is not called to the evidence which is claimed to sustain and justify this contention. In the comments of counsel for appellant on this question they say: "It was undisputed in the proof that for some years pending these court proceedings, and before the trial, the landowners had allowed the 44-acre tract to remain idle. The drainage district contended that it could have been and should have been used, and that it was allowed to remain idle for the sole purpose of influencing the jury which might try this case in increasing the amount of the damage. They could have used a ferry to advantage." Counsel for appellant said: "The failure to give this instruction shows that the scheme was successful. There was abundance of proof that it (the land) could have been used, and that they had an offer from the president of the drainage district to rent it at $4 an acre cash rent for two years, which they refused.   *   *   *   They claimed, however, that this offer was simply a bluff, and not made in good faith. The president said it was made in good faith." If it was contended before the jury and the court that this offer of $4 was only a "bluff," and the jury found against the appellant on that fact, then it is the end of that controversy. It was for the jury to determine.

The seventh assignment of error is: "The court erred in giving instruction No. 10, on its own motion, relating to interest, as follows: 'You are instructed that while this appeal has been pending there has been paid to the

plaintiffs by the defendant $600 on Oct. 16, 1911. If you find that plaintiffs' damages did not exceed this sum, then your verdict should be that plaintiffs' damages have been fully paid, and you should find for the defendant. If you find that the damages exceed $600 then you should return a verdict for plaintiffs for such sum in excess of $600, on which you should compute interest at 7 per cent. from December 23, 1909, to the present time, and, in addition thereto, interest on $600 at 7 per cent. from December 23, 1909, to October 16, 1911, the date on which the $600 was paid to plaintiffs, and return a verdict for plaintiffs for such sum.' "

If the appellees were entitled to interest, then there was no error in giving the instruction complained of. In *Chicago, R. I. & P. R. Co. v. Buel,* 56 Neb. 205, this court held: "Where, on an appeal from an award of damages for land taken for right of way purposes, the damages are found to exceed the award of the commissioners, it is proper to instruct the jury to allow interest from the time of the condemnation at the rate of 7 per cent. interest per annum." We think the principle laid down in the case cited is applicable to the instant case. In *Nemaha Valley Drainage District v. Marconnit,* 90 Neb. 514, this court held: "In the taking or damaging of private property by a drainage district corporation in carrying out the purposes of its organization, the same principles apply as to the ascertainment of damages as in the exercise of the right of eminent domain for the location of a highway, the construction of a railroad, or like instances where private property is taken or damaged for public use." The appellees appear to have been entitled to the application of this rule, and also entitled to interest upon the damages sustained. We see no error in that assignment.

The eighth assignment of error reads: "The court erred in overruling defendant's motion for a new trial." It is claimed that the verdict was excessive and unconscionable.

George L. Campen, called as a witness for the appellees, testified that out of the land of the appellees on the

east side of the river the ditch took 4.28 acres; that 1.83 acres are on the east side of the ditch; that there were 14½ acres of timber, and 26.74 acres of corn land.

Adolph Grimm testified that the land had been in corn before the appellee got it; that it was better than the high land for corn, and usually yielded 5 to 10 bushels an acre more corn than the high land did; that the timber land was mostly in ash, running from 8 to 12 inches in thickness; that a team hitched to a wagon could not be driven across the ditch; that the sides of the ditch were from 16 to 14 feet high; that the ditch was from 25 to 40 feet wide at the top; that at the bottom it ran down to a point only a few inches wide; that the fair market value of the appellees' land on the east side of the river before the ditch was put in was $100 an acre; that the old river bed was at times so that they could not drive a team across it; that the old river bed was usually overflowed in the spring; that sometimes the water would stand two or three months.

D. L. Hopper testified that the land in controversy was a rich soil and would produce about one-third more than upland; that prior to putting in the ditch the land in controversy, except the timber land, was worth $100 an acre, and the timber land $85 or $90 an acre; that after the ditch was put in the land was worthless, because you could not get at it.

John Burt testified that the land in dispute would produce from 10 to 15 bushels an acre more than the upland; that it was not safe to ford the river with a team; that the river had only frozen over once in ten years so that it would be safe to cross it with a team; that a farm wagon could not be driven across the ditch; that the fair market value of the land, outside of the timber, was $100 an acre, and that the timber was worth $85 to $90 an acre; that after the ditch was put in the land was practically worth nothing; that the two-acre tract east of the ditch was of no value, because it was too small for practical purposes, taking into consideration the fact that the appellees had to go away around to get at it.

Fred Grimm testified that the value of the land was $100 an acre before the ditch was put in, except the timber land, which was worth $90 an acre; that after the ditch went in the land was not worth anything; that the value of the two-acre tract east of the ditch was $20 an acre; that the land in controversy before the ditch was put in got the benefit of the silt that was drained from the upland every year, and was enriched thereby; that Compton never made appellees an offer of $4 an acre for the use of the land.

Ernest Grimm testified that the value of the land before the ditch was put in was $100 an acre; that the Elkhorn river goes out of its banks in the spring and fills the old cut-off, and the water remains there six or eight weeks, and during that time it is not safe to drive across it; that there is also a June rise, and the water fills the cut-off then and stays a long time before it seeps away, and during that time you cannot drive across; that after the ditch was put in the land was worth only from $5 to $10 an acre.

This court has held that when the evidence is conflicting the verdict of the jury will not be set aside, unless it is shown to be clearly wrong. *Davis v. Clark*, 94 Neb. 573; *Cushing State Bank v. Saling*, 94 Neb. 594. Along the same line is the decision of this court in *Franklin State Bank v. Chaney*, 94 Neb. 1.

There appears to be sufficient competent evidence to sustain the verdict. We are unable to discover any prejudicial error. The judgment of the district court is

AFFIRMED.

MORRISSEY, C. J., not sitting.

SEDGWICK, J., dissenting.

The question in this case is as to the measure of damages; that is, how much has this land been damaged by straightening the course of the creek? Incidentally there are questions as to whether this issue was properly submitted to the jury.

The land taken by the ditch was 4.2 acres. The land that was claimed was damaged, though not taken, was 44.3 acres, besides two acres, which .they say is isolated, and therefore damaged, making 46.3 acres. The verdict of the jury was for $3,910.63, which includes $600 that had already been paid by the defendant, and also includes interest. It might be a debatable question whether this land is damaged or benefited by this work; but that question, of course, was for the jury, and we must conclude that it was damaged. The question is whether, under any reasonable view of the evidence, it has been damaged as much as the jury has found. The plaintiffs figure out in the brief that this verdict allows $100 an acre for the land actually taken, and allows damages of $60 an acre for the land that was not taken, and insists that this is reasonable. The evidence in regard to the value of the land was conflicting, ranging somewhere from $60 to $100 an acre, and some perhaps a little higher. This damage of $60 an acre to the land not taken is wholly on account of the ditch rendering the land, as they claim, inaccessible. If we take the defendant's figures for it, they have allowed a great deal more than $60 an acre damages to the land not taken. The plaintiffs live on the north side of the Elkhorn river. The land in question was on the south side. Before this cut-off was made, to get to this land the plaintiffs went north about 100 rods, crossing a bridge over the river, and then south not quite a mile, and then west across Mr. Rodgers' land, 80 rods, to the land in question. This ditch is on the east side of the land in question, and they claim stops them from going that road. If the defendant succeeds in turning the water through this ditch so that the plaintiffs can cross the old bed of the river, they can go to their land directly in less than a half mile, but it is claimed that the water still stands in the old bed of the river and they cannot get across there now. If the defendant's claims in regard to the value of the land are somewhere near correct, then the jury has allowed the plaintiffs as damages more than the land was ever worth. It seems incredible that this tract of land is rendered

permanently inaccessible by this ditch, so as to entirely destroy its value. One hundred dollars an acre is a very high estimate of the value of any part of this land before the creek was straightened. The plaintiff, Fred Grimm, himself conceded that a large part of it was worth much less than that amount. He says that now it has no value, and so estimates that on the average it was damaged $60 an acre, and justifies the verdict. It cannot be found from this evidence that the land, or any part of it, was ever worth $100 an acre. It cannot be found that it is now worthless. It might be found that it has been rendered less valuable, at least temporarily, but reasonable men would seriously differ from that proposition. The judgment ought to be substantially reduced.

LETTON, J., concurs in this dissent.